# EXHIBIT B

## OPTION AGREEMENT

THIS OPTION AGREEMENT (this "Agreement"), is made as of this *13th* day of October, 2005, by and between NEW DIMENSION WIRELESS, LTD., a Delaware corporation (hereinafter referred to as "NDW"), and AVAXIA, INC., a *New York* corporation (hereinafter referred to as "AVX").

### WITNESSETH:

WHEREAS, NDW has acquired a PCS wireless license for Call Sign WPSJ970 (the "License") to construct and operate a personal communications services wireless telecommunications system on PCS Block C in the Plattsburg, New York Basic Trading Area, BTA #352, issued by the Federal Communications Commission (the "FCC");

WHEREAS, NDW acquired the License in part by loans (the "Loans") from private investors (the "Investors") identified on Schedule A hereto;

WHEREAS, NDW desires to grant an option to AVX to purchase the License on the terms and conditions set forth below, in part to assure that the Investors may be paid by sale of the License;

WHEREAS, concurrently, NDW and AVX have entered into a certain Exclusive Sales Agreement (the "Sales Agreement") granting AVX the exclusive distributorship of services to be provided by NDW utilizing the License;

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties, the parties hereby agree as follows:

1.   Grant of Option.

(a)   In consideration of AVX having provided financial assistance to NDW in acquiring the License and finding certain Investors to fund the acquisition, and other good valuable consideration (the "Option Price"), NDW hereby grants to AVX an exclusive option (the "Option") to purchase the License, free and clear of all debts, security interests, mortgages, trusts, claims, pledges, conditional sales agreements or other liens, liabilities and encumbrances whatsoever (collectively, "Liens").

(b)   AVX shall purchase the License for the amount owed to Investors as set forth on Schedule A (including accrued interest, if applicable) (the "Purchase Price"). The Purchase Price shall be paid by delivery to NDW of a Release and Waiver Agreement stating that

each Investor has been paid in full for the principal and interest due on its Investment, executed by each Investor at the time of closing on the sale of the License to AVX (the "Closing").

     2.   <u>Term of the Option</u>. The Option shall be exercisable at any time from the date hereof, but may not be exercised by AVX at any time that AVX is in default under the Sales Agreement, unless AVX has paid or pays NDW at least the sum of $400,000 in compensation under the Sales Agreement (i.e. for the first two years), pays all additional compensation then due and owing through the Closing Date (if the Sales Agreement continues beyond the initial two year period), and all Communications Costs due under the Agreement through the Closing Date are satisfied by payment to NDW.   In addition, AVX may undertake to deploy operational equipment necessary to satisfy FCC rules on or before January 15, 2006; in the event that AVX does not complete such deployment, NDW may deploy appropriate equipment and the cost of such deployment shall also be reimburseable to NDW on the Closing Date, provided that the equipment is also assigned and conveyed to AVX or its assignee on the Closing Date.  Subject to the above, the Option shall remain exercisable for the remaining term of the License, i.e. until May 29, 2011 (the "Option Exercise Term").Exercise of the Option shall be at AVX's sole discretion, subject to satisfaction of the conditions set forth above.

     3.   <u>Method of Exercise of the Option</u>.  AVX may exercise the Option by giving written notice thereof at any time during the Option Exercise Term.  Upon the exercise of the Option, the parties shall promptly enter into an Asset Purchase Agreement containing customary representations, warranties and closing conditions in the form attached hereto as <u>Exhibit A</u>. Licensee shall promptly furnish complete and accurate schedules to the Asset Purchase Agreement.  The parties shall jointly file, within ten (10) business days of exercise, an application with the FCC seeking its approval for the sale of the License from NDW to AVX.  In the event that AVAXIA exercises the Option but fails to enter into the Asset Purchase Agreement or to close the transaction contemplated thereby, and NDW is not in default under the Option or the Asset Purchase Agreement, the Option shall be deemed terminated.

     4.   <u>Closing</u>.  The Closing of the sale of the License shall occur within 10 business days of the FCC approval of the sale becoming a Final Order.  A grant of an application by the FCC shall be considered "Final" when it is no longer subject to administrative or judicial review, reconsideration or appeal.  The parties agree to execute such documents as are reasonably necessary to complete the transactions contemplated by this Agreement, as further set forth in the Asset Purchase Agreement.

     5.   <u>Representations and Warranties</u>. Each party hereby makes the following representations and warranties to the other party (all of which have been relied upon by the other party in entering into this Agreement):

     (a)   It is a corporation duly organized, validly existing and in good standing under the laws of the State of its incorporation.

     (b)   It has all necessary corporate power and authority to enter into and perform this Agreement and the transactions contemplated hereby, and its execution, delivery

and performance of this Agreement and the transactions contemplated hereby have been duly and validly authorized by all necessary corporate action on its part. This Agreement has been duly executed and delivered by it and this Agreement constitutes, and any other agreements to be executed in connection herewith constitute, the valid and binding obligation of such party, enforceable in accordance with their terms, except as limited by laws affecting creditors' rights or equitable principles generally.

(c)    The execution, delivery and performance of this Agreement by it: (A) will not conflict with, result in a breach of, or constitute a violation of or default under, the provisions of its articles of incorporation or by-laws or any applicable law, judgment, order, injunction, decree, rule, regulation or ruling of any governmental authority to which it is a party; and (B) will not, either alone or with the giving of notice or the passage of time, or both, conflict with, constitute grounds for termination of or result in a breach of the terms, conditions or provisions of, or constitute a default under, any agreement, instrument, license or permit to which it is now subject or by which it is bound.

6.    Covenant. NDW covenants and agrees that, from the date hereof and until the earlier of the Closing or the expiration or termination of the Option, NDW shall not cause or permit by any act, or failure to act, the License to expire, be surrendered, modified, or otherwise terminated, or cause the FCC to institute any proceedings for the suspension, non-renewal, revocation or adverse modification of any of the FCC Authorizations, or any material application to the FCC to be dismissed or denied.

7.    Specific Performance. NDW and AVX each recognize and acknowledge that, in the event that NDW shall fail to perform its obligations to consummate the transaction contemplated hereby, money damages alone will not be adequate to compensate AVX for its injury. NDW and AVX, therefore, each agree and acknowledge that, in the event of Licensee's failure to perform its obligation to consummate the transaction contemplated hereby, AVX shall be entitled, in addition to any action for monetary damages, and in addition to any other rights and remedies on account of such failure, to specific performance of the terms of this Agreement and of NDW's obligation to consummate the transactions contemplated hereby. If any action is brought by either to enforce this Agreement, NDW shall waive the defense that there is an adequate remedy at law.

8.    Notices. All notices and other communications permitted or required under this Agreement shall be in writing and shall be deemed effectively given or delivered upon personal delivery or twenty-four (24) hours after delivery to a courier service which guarantees overnight delivery or five (5) days after deposit with the U.S. Post Office, by registered or certified mail, postage prepaid, and, in the case of courier or mail delivery, addressed as follows (or at such other address for a party as shall be specified by like notice):

If to NDW to:

3

If to AVX, to:

9.    <u>Binding Effect</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

10.    <u>Assignment</u>.  NDW may not assign its rights or obligations under this Agreement. AVX may assign its rights and obligations under this Agreement, provided, that AVX shall remain liable for performance of its duties hereunder to NDW.

11.    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to the choice of law principles thereof.

12.    <u>Headings</u>.  The headings herein are included for ease of reference only and shall not control or affect the meaning or construction of the provisions of this Agreement.

13.    <u>Counterparts</u>.  This Agreement may be signed in counterpart originals, which collectively shall have the same legal effect as if all signatures had appeared on the same physical document.  This Agreement may be signed and exchanged by facsimile transmission, with the same legal effect as if the signatures had appeared in original handwriting on the same physical document.

14.    <u>Entire Agreement</u>.  This Agreement, and the exhibits attached hereto, constitute the entire understanding and agreement between the parties with respect to the subject matter contained herein, and supersedes all prior negotiations, agreements, or letters of intent between the parties and cannot be amended, supplemented, or changed except by a writing signed by the parties hereto.  When executed, the Asset Purchase Agreement shall supersede the provisions hereof in their entirety.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, this Option Agreement has been executed by each of the parties as of the date first written above.

**NEW DIMENSION WIRELESS, LTD.**

By: _____ | CEO

**AVAXIA INC.**


By: _____

Oct-14-2005  06:27pm    From-ROBERT M SIMELS P.C.                    2123694516              T-281   P.005/025   F-725

IN WITNESS WHEREOF, this Option Agreement has been executed by each of the parties as of the date first written above.

NEW DIMENSION WIRELESS, LTD.

By:_____

AVAXIA INC.

By: _____

5

SCHEDULE A

INVESTORS

| | | | |
|---|---|---|---|
| 1. | Brian Pieroni | $122,000 | 12/1/04 |
| 2. | UCall, Inc. | $ 90,000 | 12/1/04 |
| 3. | NY Access | $ 18,000 | 12/1/04 |
| 4. | Roger Smith | $ 50,000 | 2/1/05 |

EXHIBIT A

## LICENSE PURCHASE AGREEMENT

between

### NEW DIMENSION WIRELESS LTD.

**Seller**

**and**

### AVAXIA, INC.

**Buyer**

## LICENSE PURCHASE AGREEMENT

This License Purchase Agreement (the "Agreement") is entered into as of this _____ day of _____ by and between **NEW DIMENSION WIRELESS, LTD.**, a Delaware corporation ("Seller"), and **AVAXIA, INC.**, a _____ corporation ("Buyer"). (Seller and Buyer may be individually referred to as a "Party" and may be collectively referred to as the "Parties").

## RECITALS:

**WHEREAS**, Seller holds station license for Call Sign WPSJ970 issued by the FCC (the "FCC License") authorizing Seller to construct and operate a personal communication services wireless telecommunications system on PCS Block C in the Plattsburg, New York Basic Trading Area, BTA #352 (the "License").

**WHEREAS**, Seller desires to sell, assign and transfer to Buyer, and Buyer desires to purchase from Seller, the FCC License on the terms and subject to the conditions set forth herein.

**WHEREAS**, the acquisition of the FCC License is subject to prior approval of the FCC.

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, each intending to be legally bound, do hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Defined terms used in this Agreement shall have the meanings ascribed to them in this Agreement, except that as used herein, the following terms which are not elsewhere defined herein have the meanings set forth below:

"Affiliate" shall mean a person that directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, the first person.

"Applicable Law" shall mean all applicable provisions of all (i) constitutions, treaties, statutes, laws (including the common law), rules, regulations, ordinances, codes or orders of any Governmental Authority including without limitation the Communications Act of 1934, as amended, and FCC rules, (ii) licenses, permits, consents and/or approvals from any Governmental Authority and (iii) orders, decisions,

8

injunctions, judgments, awards and decrees of or agreements with any Governmental Authority.

"Business Day" shall mean a day other than Saturday or Sunday on which federally chartered banks are generally open for business in the city of New York, New York.

"Control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a person, whether through the ownership of voting securities, by contract or credit arrangement, as trustee or executor or otherwise.

"FCC" means the Federal Communications Commission or any successor agency.

"FCC Order" means an order or decision of the FCC granting its consent to the assignment of the FCC License from Seller to Buyer in furtherance of the transaction contemplated hereby.

"Final Order" means an action of the FCC that has not been reversed, stayed, enjoined, set aside, annulled or suspended; with respect to which no timely petition for reconsideration or administrative or judicial appeal or *sua sponte* action of the FCC with comparable effect is pending and as to which the time for filing any such petition or appeal (administrative or judicial) or for the taking of any such *sua sponte* action of the FCC has expired.

"Governmental Authority" means any federal, state, municipal or other local governmental authority, agency, board or body to which a Party hereto or its assets is subject.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, right of others, claim, security interest, encumbrance, lease, sublease, license, occupancy agreement, adverse claim or interest, easement, covenant, encroachment, burden, title defect, title retention agreement, voting trust agreement, interest, equity, option, lien, right of first refusal, charge or other restrictions or limitations of any nature whatsoever whether voluntarily incurred or arising by operation of law or otherwise.

"Material Adverse Effect" means any event, occurrence, fact, condition, change or effect that is materially adverse to the FCC License, other than a change in market conditions.

## ARTICLE II

## PURCHASE AND SALE; ASSUMPTION OF LIABILITIES

9

2.1    Purchase and Sale.  Subject to the terms and conditions hereof and in reliance upon the representations, warranties, covenants and agreements contained herein, Seller agrees to sell, convey, assign, transfer and deliver to Buyer, and Buyer agrees to purchase from Seller on the Closing Date (as hereinafter defined), all of Seller's right, title and interest in and to the FCC License (and any renewals, extensions, amendments or modifications thereof), free and clear of any Liens.

2.2    Assumption of Liabilities.  Buyer shall not assume, or otherwise be responsible for, any liabilities, obligations or indebtedness of Seller or any of its Affiliates, whether direct or indirect, liquidated or unliquidated, known or unknown, whether accrued, absolute, contingent, matured, unmatured or otherwise, and whether arising out of occurrences prior to, at or after the date hereof, other than any claims, causes of action, obligations and liabilities arising out of, or based upon, or relating to the FCC License after the Closing.  At the Closing and as a result of the assignment of the FCC License, Buyer shall assume all claims, causes of action, obligations and liabilities arising out of, or based upon, or relating to the FCC License from and after the Closing.

## ARTICLE III

## PURCHASE PRICE

3.1    Purchase Price.  The aggregate consideration for the sale of the FCC License will be as set forth in the Option Agreement.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer as follows:

4.1    Organization and Good Standing.  Seller is a corporation duly organized, validly existing and in good standing under the laws of the state of Delaware.  Seller has all requisite power to own, operate and lease its properties and carry on its business as it is now being conducted and as the same will be conducted until the Closing.

4.2    Authorization and Binding Effect of Documents.  Subject only to approval by Seller's Board of Directors, which Seller shall strive to obtain within twenty calendar days: (1) The execution and delivery of, and the performance of its obligations under, this Agreement by Seller, and the consummation by Seller of the transactions contemplated hereby, have been duly authorized and approved by all necessary  action on the part of Seller and its stockholders and directors as required by the laws of its state of formation and Seller's organizational documents; (2) Seller has the power and authority to execute,

deliver and perform its obligations under this Agreement and each of the other conveyance documents and to consummate the transactions hereby; and (3) This Agreement constitutes a legal and valid obligation of Seller enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting the enforcement of creditors' rights or remedies generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

4.3    No Conflicts.  The execution and delivery of, and the performance of its obligations under, this Agreement by Seller, and the consummation by Seller of the transactions contemplated hereby:

(a)    do not in any material respect (with or without the giving of notice or the passage of time or both) violate any provision of Applicable Law or result in the creation of any Lien on the FCC License;

(b)    do not (with or without the giving of notice or the passage of time or both) conflict in any material respect with or result in a breach or termination of, or constitute a default or give rise to a right of termination or acceleration under, the articles of organization or operating agreement of Seller or pursuant to any agreement, commitment or other instrument which Seller is a party to or bound by or by which the FCC License may be bound.

4.4    Legal Compliance; Governmental Consents and Consents of Third Parties.

(a)    Seller has complied in all material respects with all Applicable Laws and is not in violation in any material respect of any Applicable Law, nor has Seller received any notice alleging any conflict with, violation of, breach of or default under any Applicable Law, except where the failure to comply would not reasonably be expected to have a Material Adverse Effect or be materially adverse to the Seller's ability to consummate the transactions contemplated hereby.

(b)    Except for the consent of the FCC described in Section 6.2 below and the filing of the requisite post-closing consummation notice with the FCC, no consent, approval or authorization of, or declaration or filing with, any Governmental Authority or third parties is required in connection with the execution, delivery or performance by Seller of this Agreement or any other documents executed by Seller for purposes of consummating the assignment of the FCC License.

4.5    Title.  Seller is the sole and exclusive legal and equitable owner of, and has good title to, and the power to transfer good title to, the FCC License, free and clear of any and all Liens. The FCC License was granted to Seller by Final Order.  The FCC License is not subject to any FCC debt or unjust enrichment payment obligation under FCC rules.  Seller has not sold, transferred, assigned or leased, nor is Seller obligated under any other agreement to sell, transfer, assign or lease all or any part of the spectrum whose use is authorized under the FCC License.

4.6    <u>Brokers</u>. Seller has not retained or otherwise acted to entitle any entity to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement.

4.7    <u>FCC License</u>. The FCC License is in full force and effect. Seller has not built or encumbered in any way the FCC License. All fees due and payable to Governmental Authorities with regard to the initial issuance of the FCC License and, to the best of Seller's knowledge, all other fees relating to or arising out of the rules governing the FCC License have been paid. Seller's ownership and operation of the FCC License complies in all material respects with Applicable Law. All material reports required of Seller to be filed in connection with the FCC License have been timely filed and are accurate and complete. Other than conditions generally applicable under the rules and regulations of the FCC, there is no condition upon the FCC License except as stated on the face thereof. Upon construction of the facilities specified in the FCC License, Seller is not aware of any reason, fact or circumstance by which another facility would cause objectionable interference to the transmissions of the Buyer's facilities, or that would cause the Buyer's facilities to transmit objectionable interference with the transmissions of any other protected facility No event has occurred with respect to the FCC License which, with the giving of notice or the lapse of time or both, would constitute grounds for suspension, termination, cancellation, revocation or material modification of the FCC License. Seller is in compliance in all material respects with the terms of the FCC License, as applicable, and there is no condition, event or occurrence existing, nor is there any proceeding being conducted of which the Seller has received notice, nor, to the knowledge of Seller, is there any proceeding threatened by any Governmental Authority or an other fact which would cause the termination, suspension, cancellation or non-renewal of the FCC License, or the imposition against the Seller of any penalty or fine by any Governmental Authority by reason of the ownership or operation under the FCC License.

4.8    <u>Litigation</u>.

There is no action, claim, demand, suit, proceeding, arbitration, grievance, citation, summons, subpoena, inquiry or investigation of any nature, civil, criminal, regulatory or otherwise, in law or in equity, pending or, to the knowledge of Seller, threatened against or relating to the FCC License or which seeks to enjoin or rescind the transactions contemplated by this Agreement or otherwise prevent Seller from complying with the terms and provisions of this Agreement.

4.9    <u>No Material Omission</u>.

No representation or warranty made by Seller in this Agreement, and no statement made in any certificate, document, exhibit or schedule furnished or to be furnished in connection with the transactions herein contemplated, contains or will contain any untrue

statement of a material fact or omits or will omit to state any material fact necessary to make such representation or warranty or any such statement not misleading to Buyer.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows:

5.1    Organization and Good Standing.  Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.  Buyer has all requisite legal authority to own, operate and lease its properties and carry on its business as it is now being conducted and as the same will be conducted following the Closing.

5.2    Authorization and Binding Effect of Documents.  Buyer's execution and delivery of, and the performance of its obligations under, this Agreement and each of the other closing documents, and the consummation by Buyer of the transactions contemplated hereby, have been duly authorized and approved by all necessary actions on the part of Buyer.  This Agreement and each of the other documents to be executed by Buyer have been, or at or prior to the Closing will be, duly executed by Buyer.  This Agreement, when executed and delivered by the Parties hereto, will constitute the valid and legally binding agreement of Buyer, enforceable against Buyer in accordance with their terms, except as may be limited by bankruptcy, insolvency, or other similar laws affecting the enforcement of creditors= rights generally, and except as may be limited by general principles of equity (regardless of whether such enforceability is sought in a proceeding in equity or at law).

5.3    Absence of Conflicts.  Buyer's execution and delivery of, and the performance of its obligations under, this Agreement and each of the other documents and the consummation by Buyer of the transaction contemplated hereby:

(a)    Do not in any material respect (with or without the giving of notice or the passage of time or both) violate (or result in the creation of any claim, lien, charge or encumbrance on any of the assets or properties of Buyer under) any provision of any Applicable Law in any manner which would have a material adverse effect on the FCC License or financial condition of Buyer;

(b)    Do not (with or without the giving of notice or the passage of time or both) conflict with or result in a breach or termination of, or constitute a default or give rise to a right of termination or acceleration under, the organizational documents of Buyer or any lease, agreement, commitment or other instrument which Buyer is a party to or bound by or by which any of its assets or properties may be bound.

5.4     <u>Governmental Consents and Consents of Third Parties</u>.  Except for the required consent of the FCC, Buyer's execution and delivery of, and the performance of its obligations under, this Agreement and the other closing documents and the consummation by Buyer of the transaction contemplated hereby, do not require the consent, waiver, approval, permit, license, clearance or authorization of, or any declaration or filing with, any court or public agency or other authority, or the consent of any person under any agreement, arrangement or commitment of any nature which Buyer is a party to or bound by, the failure of which to obtain would have a material adverse effect on the FCC License.

5.5     <u>Qualification</u>.  Buyer is legally, financially and technically qualified to hold the FCC License and Buyer's qualifications to hold a Commercial Mobile Radio Service license is not currently being challenged in any proceeding pending before the FCC.  Buyer qualifies as a very small business under the rules of the FCC, and in the event the FCC determines Buyer not to be so qualified, Buyer shall be solely responsible for any unjust enrichment payment obligations.

5.6     <u>Broker's or Finder's Fees</u>.  Buyer has not engaged any brokers in connection with the transactions contemplated by this Agreement or otherwise acted to entitle any entity to any broker's or finder's fee or any other commission or similar fee, directly or indirectly, in connection with the transactions contemplated by this Agreement.

5.7     <u>Litigation</u>.  There is no action, claim, demand, suit, proceeding, arbitration, grievance, citation, summons, subpoena, inquiry or investigation of any nature, civil, criminal, regulatory or otherwise, in law or in equity, pending or, to the knowledge of Buyer, threatened against or relating to the Buyer or which seeks to enjoin or rescind the transactions contemplated by this Agreement or otherwise prevent Seller from complying with the terms and provisions of this Agreement.

5.8     <u>Financial Qualifications</u>. Buyer is financially qualified and has cash on hand or from committed funds sufficient to consummate the transaction contemplated hereby and has place into escrow with Shaw Pittman LLP the Escrow Funds.

5.9     <u>No Material Omission</u>.  No representation or warranty made by Buyer in this Agreement, and no statement made in any certificate, document, exhibit or schedule furnished or to be furnished in connection with the transactions herein contemplated, contains or will contain any untrue statement of a material fact or omits or will omit to state any material fact necessary to make such representation or warranty or any such statement not misleading to Seller.

## ARTICLE VI

## ACTIONS PRIOR TO THE CLOSING DATE

6.1     Conduct.  Seller covenants and agrees with Buyer that between the date hereof and the Closing Date, unless the Buyer otherwise agrees in writing, Seller shall not:  mortgage, pledge or subject to any Lien, sell, lease or otherwise dispose of, nor agree to sell, lease or otherwise dispose of, the FCC License.  In addition, Seller shall undertake best efforts to obtain approval of this Agreement by its Board of Directors within twenty calendar days of this date.

6.2     Governmental Consents.  Seller and Buyer shall file with the FCC, within ten (10) Business Days after the execution of this Agreement, such applications and other documents in the name of Seller or Buyer, as appropriate, as may be necessary or advisable to obtain the FCC Order.   Seller and Buyer shall take all commercially reasonable steps necessary to prosecute such filings with diligence and shall diligently oppose any objections to, appeals from or petitions to reconsider such approval of the FCC, to the end that the FCC Order and the FCC Final Order may be obtained as soon as practicable; provided, however, that in the event the application for assignment of the FCC License has been designated for hearing, either Buyer or Seller may elect to terminate this Agreement pursuant to Section 11.1(c).

6.3     Reasonable Best Efforts.   Subject to the terms and conditions of this Agreement, each of the Parties hereto will use its reasonable best efforts to take all action and to do all things necessary, proper or advisable to satisfy any condition to the Parties' obligations hereunder in its power to satisfy and to consummate and make effective as soon as practicable the transactions contemplated by this Agreement.

6.4     FCC Reports.   Seller shall continue to file, on a current basis until the Closing Date, all reports and documents required to be filed with the FCC with respect to the FCC License.  Seller shall provide Buyer with copies of all such filings within five (5) Business Days of the filing with the FCC.

## ARTICLE VII

## CONDITIONS PRECEDENT TO THE
## OBLIGATIONS OF BUYER TO CLOSE

The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of each of the following conditions, unless otherwise waived in writing by Buyer:

7.1     Representations and Warranties.   The representations and warranties of Seller contained herein shall be true and correct in all material respects as of the Closing Date, except where such representations and warranties are intended to be made only as of the date of this Agreement.

7.2     Performance.  Seller shall have duly performed or complied in all material

respects with all of the covenants, acts and obligations to be performed or complied with by Seller hereunder prior to the Closing, including, but not limited to, timely obtaining approval for this Agreement by Seller's Board of Directors.

7.3    <u>No Material Adverse Effect</u>.    No event, occurrence, fact, condition, change, development or effect shall have occurred, exist or come to exist since the date hereof, that, individually or in the aggregate, has constituted or resulted in, or could reasonably be expected to constitute or result in, a Material Adverse Effect.

7.4    <u>Consents</u>.    The FCC shall have issued the FCC Order and the FCC Order shall have become a Final Order, free of any special conditions not generally applicable to licenses or transactions of the type contemplated hereunder, which are materially adverse to Buyer, and free of the imposition of any unjust enrichment penalties.

7.5    <u>Seller's Closing Documents</u>.    Seller shall have delivered the following at the Closing:

(a)    an executed assignment with respect to the FCC License in form and substance reasonably satisfactory to Buyer, as shall be necessary to evidence or perfect the sale, assignment, transfer and conveyance of the FCC License to Buyer and effectively vest in Buyer all right, title and interest in the FCC License, free and clear of any and all Liens thereof, all in accordance with the terms and conditions of this Agreement;

(b)    a certificate of an officer, manager or member of Seller certifying that all representation and warrants of Seller are true and correct as of the Closing Date and all covenants and conditions required to be performed or complied with by Seller as of the Closing Date have been timely satisfied by Seller or waived by Buyer; and

(c)    such other certificates, instruments or documents as Buyer may reasonably request in order to effect and document the transactions contemplated hereby.

## ARTICLE VIII

## CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLER TO CLOSE

The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of each of the following conditions unless otherwise waived in writing by Seller:

8.1    <u>Representations and Warranties</u>.    The representations and warranties of Buyer contained herein or in any document delivered pursuant hereto shall be true and correct in all material respects as of the Closing Date.

8.2    <u>Performance</u>.  Buyer shall have performed or complied in all material respects with all covenants, acts and obligations to be performed or complied with by Buyer hereunder at or prior to the Closing.

8.3    <u>Consents</u>.  The FCC shall have issued the FCC Order free of any special conditions not generally applicable to licenses or transactions of the type contemplated hereunder which are materially adverse to Seller and free of the imposition of any unjust enrichment penalties attributable to the status or actions of Buyer.

8.4    <u>Buyer's Closing Documents and Action</u>s.  At the Closing, Buyer shall deliver to Seller the following:

(a)    the Purchase Price as provided in Article III;

(b)    a certificate of an officer of Buyer certifying that all representations and warranties of Buyer are true and correct as of the Closing Date and all covenants and conditions required to be performed or complied with by Buyer as of the Closing Date have been timely satisfied by Buyer or waived by Seller; and

(c)    such certificates, instruments and documents as Seller may reasonably request in order to effect and document the transactions contemplated hereby.

## ARTICLE IX

## CLOSING

9.1    <u>Time and Place</u>.  The consummation of the transactions contemplated in Article VIII (the "<u>Closing</u>") shall take place at the offices of Pillsbury Winthrop Shaw Pittman, 2300 N Street NW, Washington DC, or such other place as the Parties shall agree in writing, on or before the Fifth (5th) Business Day following the date on which the FCC Order is obtained, upon three 3) business days written notice to Buyer,  in either case provided that all of the conditions set forth in Articles VII and VIII have been met or waived (the "<u>Closing Date</u>").  The Closing shall be effective as of 12:01 a.m. on the Closing Date.

## ARTICLE X

## SURVIVAL OF REPRESENTATIONS AND WARRANTIES; INDEMNIFICATION

10.1    <u>Survival of Representation and Warranties</u>.    All representations, warranties, covenants and agreements contained in this Agreement or in any other document shall survive the Closing for a period of two years and the Closing shall not be deemed a waiver by either Party of the representations, warranties, covenants or agreements of the other Party contained herein or in any other closing document.

10.2   <u>Indemnification in General</u>.  Buyer and Seller agree that the rights to indemnification and to be held harmless set forth in this Agreement shall, as between the Parties hereto and their respective successors and assigns, be exclusive of all rights to indemnification and to be held harmless that such Party (or its successors or assigns) would otherwise have by statute, common law or otherwise.

10.3   <u>Indemnification by Seller</u>.  Subject to the provisions of <u>Subsection (b)</u> below, Seller shall indemnify and hold harmless Buyer and any officer, director, agent, employee, member and affiliate thereof with respect to any and all demands, claims, actions, suits, proceedings, assessments, judgments, costs, losses, damages, liabilities and expenses (including reasonable attorneys' fees) relating to or arising out of:

(a)   Any breach or non-performance by Seller of any of its representations, warranties, covenants or agreements set forth in this Agreement or any other Document; or

(b)   The ownership or operation of the FCC License prior to the Closing Date; or

(c)   All other liabilities and obligations of Seller.

10.4   <u>Indemnification by Buyer</u>.  Buyer shall indemnify and hold harmless Seller and any officer, director, agent, employee and affiliate thereof with respect to any and all demands, claims, actions, suits, proceedings, assessments, judgments, costs, losses, damages, liabilities and expenses (including reasonable attorneys' fees) relating to or arising out of:

(a)   Any breach or non-performance by Buyer of any of its representations, warranties, covenants or agreements set forth in this Agreement or any other Document;

(b)   The ownership or operation of the FCC License on or after the Closing Date; or

(c)   All other liabilities and obligations of Buyer.

10.5   <u>Indemnification Procedures</u>.  In the event that an Indemnified Party may be entitled to indemnification hereunder with respect to any asserted claim of, or obligation or liability to, any third party, such Party shall notify the Indemnifying Party thereof, describing the matters involved in reasonable detail, and the Indemnifying Party shall be entitled to assume the defense thereof upon written notice to the Indemnified Party with counsel reasonably satisfactory to the Indemnified Party; provided, that once the defense thereof is assumed by the Indemnifying Party, the Indemnifying Party shall keep the Indemnified Party advised of all developments in the defense thereof and any related litigation, and the Indemnified Party shall be entitled at all times to participate in the defense thereof at its own expense.  If the Indemnifying Party fails to notify the

Indemnified Party of its election to defend or contest its obligation to indemnify under this Article 10.5, the Indemnified Party may pay, compromise, or defend such a claim without prejudice to any right it may have hereunder.

## ARTICLE XI

## TERMINATION

11.1    Termination.    This Agreement may be terminated by written notice under any one or more of the following circumstances:

(a)    by mutual consent of Seller and Buyer at anytime;

(b)    by Seller or Buyer, if the Closing has not occurred on or before twelve (12) months from the date hereof  by reason of the failure of any condition precedent under Articles VII or VIII through no fault of the terminating Party;

(c)    by either Buyer or Seller at any time after a material breach of any representation, warranty, covenant or condition by the other party, which material breach has not been cured within thirty (30) days after written notice thereof from the non-breaching party.

11.2    Effect of Termination.    With respect thereto, in the event of termination of this Agreement as provided above, this Agreement shall forthwith become void and there shall be no further liability of any kind hereunder on the part of Seller or Buyer, except that termination of this Agreement at any time shall not relieve either party of any liability or obligation arising prior to the date of termination.

## ARTICLE XII

## MISCELLANEOUS

12.1    Further Actions.    From time to time before, at and after the Closing, each Party, at its expense and without further consideration, will execute and deliver such documents to the other Party, and take all such actions, as the other Party may reasonably request in order more effectively to consummate the transactions contemplated hereby.

12.2    Payment of Expenses.

(a)    Any fees assessed by the FCC in connection with the filings contemplated by this Agreement or consummation of the transactions contemplated hereby shall be shared equally between Seller and Buyer.

(b)    Except as otherwise expressly provided in this Agreement, each of the Parties shall bear its own expenses, including the fees of any attorneys and

accountants engaged by such Party, in connection with this Agreement and the consummation of the transactions contemplated herein.

12.3    Specific Performance.  Seller acknowledges that the FCC License is of a special, unique and extraordinary character, and that any breach of this Agreement by Seller could not be compensated for by damages.  Accordingly, if Seller shall breach its obligations under this Agreement, Buyer shall be entitled, in lieu of any other remedies that it may have, to enforcement of this Agreement (subject to obtaining any required approval of the FCC) by decree of specific performance or injunctive relief requiring Seller to fulfill its obligations under this Agreement.  In any action by Buyer to equitably enforce the provisions of this Agreement, Seller shall waive the defense that there is an adequate remedy at law or equity and agrees that Buyer shall have the right to obtain specific performance of the terms of this Agreement without being required to prove actual damages, post bond or furnish other security.

12.4    Notices.  All notices, demands or other communications given hereunder shall be in writing and shall be sufficiently given if delivered by courier or sent by registered or certified mail, first class, postage prepaid, overnight courier or by facsimile telecopy or similar written means of communication, addressed as follows:

      (a)    if to Seller, to:

> 201 Pennsylvania Avenue NW Suite 300
> Washington DC 20004
> Attn:  Anthony Harper
> Facsimile No.:  801-848-1540

> With a copy which shall not itself constitute notice to

> Glenn S. Richards, Esq.
> Shaw Pittman LLP
> 2300 N Street, NW
> Washington, DC 20037

      (b)    if to Buyer, to:

> 1

or such other address with respect to any Party hereto as such Party may from time to time notify (as provided above) to the other Party hereto.  Any such notice, demand or communication shall be deemed to have been given (i) if so mailed, as of the close of the third Business Day following the date mailed, and (ii) if personally delivered or otherwise sent as provided above, on the date received.

12.5    Entire Agreement.  This Agreement and the Schedules hereto, and the other closing documents constitute the entire agreement and understanding between the Parties hereto with respect to the subject matter hereof and supersede any prior negotiations, agreements, understandings or arrangements between the Parties with respect to the subject matter hereof.

12.6    Binding Effect; Benefits.  Except as otherwise provided herein, this Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective successors or assigns.  Except to the extent specified herein, nothing in this Agreement, express or implied, shall confer on any person other than the Parties hereto and their respective successors or assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement.

12.7    Assignment.  This Agreement and any rights hereunder shall not be assignable by either Party hereto without the prior written consent of the other Party; provided, however, that Buyer may, upon notice to Seller, assign its rights and obligations under this Agreement to any Affiliate prior to Closing, provided that such assignment will not materially delay the Closing and provided further that in such event, Buyer shall remain secondarily liable for the assignee's performance hereunder.

12.8    Governing Law.  This Agreement shall in all respects be governed by and construed in accordance with the laws of the State of Delaware (without application of principles of conflicts of law).

12.9    Amendments and Waivers.  No term or provision of this Agreement may be amended, waived, discharged or terminated orally but only by an instrument in writing signed by the Party against whom the enforcement of such amendment, waiver, discharge or termination is sought.  Any waiver shall be effective only in accordance with its express terms and conditions.

12.10    Severability.  Any provision of this Agreement which is unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such unenforceability without invalidating the remaining provisions hereof, and any such unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, the Parties hereto hereby waive any provision of law now or hereafter in effect which renders any provision hereof unenforceable in any respect.

12.11    Headings.  The captions in this Agreement are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

12.12    Counterparts.  This Agreement may be executed in any number of counterparts, and by either Party on separate counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

12.13  Interpretation.  As both Parties have participated in the drafting of this Agreement, any ambiguity shall not be construed against either Party as the drafter.

12.14  Further Assurances.  For a period of twelve (12) months after Closing, Seller agrees to provide to Buyer from time to time any information that Seller possesses with respect to the FCC License prior to the Closing which the Buyer reasonably requests in the future.

12.15  Third Parties.  Nothing herein, expressed or implied, is intended to or shall confer on any person other than the Parties hereto any rights, remedies, obligations or liabilities under or by reason of this Agreement.

12.16  No Public Announcement.  No Party shall, without the approval of the other, make any press release or other public announcement concerning the transaction contemplated by this Agreement, except as and to the extent that any such Party shall be obligated by law, in which case the other Party shall be advised and the Parties shall use their reasonable efforts to cause a mutually agreeable release or announcement to be issued; provided, that the forgoing shall not preclude communications or disclosures necessary to implement the provisions of this Agreement or to comply with accounting or Securities and Exchange Commission disclosure obligations or applicable FCC disclosure obligations, including in connection with obtaining the Final Order, by a Party or any of its Affiliates.

12.17  Litigation Expenses.  In the event that any litigation is commenced regarding the transaction contemplated by the Agreement, the non-prevailing Party in such litigation shall be responsible for all expenses associated therewith, including reasonable attorney's fees.